IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| EXXON MOBIL CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 4:13-cv-02906 |
| v. | ) | |
| | ) | |
| FX NETWORKS, LLC, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' REPLY IN SUPPORT OF THEIR CONSOLIDATED
MOTION TO EXCLUDE THE EXPERT REPORTS AND TESTIMONY OF
DR. DAVID STEWART AND DR. JAMES POMERANTZ**

**ANDREWS KURTH LLP**

Paul L. Mitchell
Tex. Bar No. 14217920
(Fed. Bar. No. 07495)
Brian C. Pidcock
Tex. Bar No. 24074895
(Fed. Bar No. 1654553)
Joseph W. Golinkin II
Tex. Bar No. 24087596
(Fed. Bar No. 2515657)
600 Travis, Suite 4200
Houston, Texas  77002
Telephone:  (713) 220-3995
Facsimile:  (713) 238-7246

**KILPATRICK TOWNSEND & STOCKTON LLP**

William H. Brewster (*pro hac vice*)
(*Attorney-in-charge for Defendants*)
R. Charles Henn Jr. (*pro hac vice*)
Sabina A. Vayner (*pro hac vice*)
Jessica A. Pratt (*pro hac vice*)
1100 Peachtree Street, Suite 2800
Atlanta, Georgia  30309-4528
Telephone:  (404) 815-6500
Facsimile:  (404) 815-6555

Larry McFarland (*pro hac vice*)
9720 Wilshire Boulevard PH
Beverly Hills, California  90212-2018
Telephone:  (310) 777-3750
Facsimile:  (310) 388-5917

*Attorneys for Defendants*

## **TABLE OF CONTENTS**

I.    INTRODUCTION ..................................................................................................1

II.   THE STEWART SURVEY SHOULD BE EXCLUDED .............................2

    A.    Dr. Stewart Did Not Use the Proper Survey Format for this
         Case. ..................................................................................................2

    B.    Dr. Stewart Failed to Present the Marks in Real-World Context. ........6

    C.    The Stewart Survey Did Not Include a Proper Control. .....................10

III.  DR. POMERANTZ'S TESTS SHOULD BE EXCLUDED........................14

    A.    The Pomerantz Study Tested only a Fragment of the FXX
         Mark. ................................................................................................14

    B.    Dr. Pomerantz Failed to Provide any Real World Context................16

    C.    Dr. Pomerantz Failed to Limit His Study to Relevant
         Consumers. .......................................................................................17

IV.   CONCLUSION...............................................................................................18

## <u>TABLE OF AUTHORITIES</u>

### <u>Cases</u>

*24 Hour Fitness USA, Inc. v. 24/7 Tribeca Fitness, LLC*,
   277 F. Supp. 2d 356 (S.D.N.Y. 2003).................................................................6

*Bd. of Regents, Univ. of Tex. Sys. ex rel. Univ. of Tex. at Austin v. KST*
   *Elec., Ltd.*,
   550 F. Supp. 2d 657 (W.D. Tex. 2008)...............................................................5

*Blockbuster Entm't Grp., Div. of Viacom, Inc. v. Laylco, Inc.*,
   869 F. Supp. 505 (E.D. Mich. 1994)..................................................................5

*Brighton Collectibles, Inc. v. RK Tex. Leather Mfg.*,
   923 F. Supp. 2d 1245 (S.D. Cal. 2013).............................................................13

*Componentone, L.L.C. v. Componentart, Inc.*,
   No. 02:05cv1122, 2008 WL 4790661 (W.D. Pa. Oct. 27, 2008) ........................7

*Conopco, Inc. v. Cosmair, Inc.*,
   49 F. Supp. 2d 242 (S.D.N.Y. 1999)..................................................................7

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
   509 U.S. 579 (1993) ................................................................................. 1, 4, 7

*Firefly Digital Inc. v. Google Inc.*,
   817 F. Supp. 2d 846 (W.D. La. 2011)...............................................................14

*Gucci v. Gucci Shops, Inc.*,
   688 F. Supp. 916 (S.D.N.Y. 1988).................................................................8, 9

*J.T. Colby & Co., Inc. v. Apple Inc.*,
   No. 11 Civ. 4060(DLC), 2013 WL 1903883 (S.D.N.Y. May 8, 2013)................8

*Juicy Couture, Inc. v. L'Oreal USA, Inc.*,
   No. 04 civ.7203(DLC), 2006 WL 1012939 (S.D.N.Y. Apr. 19, 2006)............7, 8

*Juicy Couture, Inc. v. L'Oreal USA, Inc.*,
   No. 04 civ.7203(DLC), 2006 WL 2591478 (S.D.N.Y. Sept. 11, 2006)...............8

*Kargo Global, Inc. v. Advance Magazine Publishers, Inc.*,
   No. 06 Civ. 550(JFK), 2007 WL 2258688 (S.D.N.Y. Aug. 6, 2007)...............3, 4

*M.D. On-Line, Inc. v. WebMD Corp.*,
   No. 05-CV-4081 (WJM), 2005 WL 2469668 (D. N.J. Oct. 6, 2005)...................7

*Malletier v. Dooney & Bourke, Inc.*,
   525 F. Supp. 2d 558 (S.D.N.Y. 2007)...................................................................7

*Nelson v. Tenn. Gas Pipeline Co.*,
   243 F.3d 244 (6th Cir. 2001)...............................................................................4

*Paul Sachs Originals Co. v. Sachs*,
   217 F. Supp. 407 (S.D. Cal. 1963), *aff'd*, 325 F.2d 212 (9th Cir. 1963).............15

*Pilot Corp. of America v. Fisher-Price, Inc.*,
   344 F. Supp. 2d 349 (D. Conn. 2004)........................................................ 12, 13

*Rider v. Sandoz Pharm. Corp.*,
   295 F.3d 1194 (11th Cir. 2002) ...........................................................................1

*Scott Fetzer Co. v. House of Vacuums Inc.*,
   381 F.3d 477 (5th Cir. 2004).................................................................. 1, 14, 18

*Siharath v. Sandoz Pharm. Corp.*,
   131 F. Supp. 2d 1347 (N.D. Ga. 2001) .................................................................1

*Simon Prop. Grp. L.P. v. mySimon, Inc.*,
   104 F. Supp. 2d 1033 (S.D. Ind. 2000) .................................................................1

*THOIP v. Walt Disney Co.*,
   690 F. Supp. 2d 218 (S.D.N.Y. 2010)......................................................... 1, 3, 4

*Water Pik, Inc. v. Med-Sys., Inc.*,
   726 F.3d 1136 (10th Cir. 2013) ..................................................................... 7, 13

*WE Media Inc. v. Gen. Elec. Co.*,
   218 F. Supp. 2d 463 (S.D.N.Y. 2002)...............................................................7, 8

*Xtreme Lashes, LLC v. Xtended Beauty, Inc.*,
   576 F.3d 221 (5th Cir. 2009).............................................................................16

**Statutes**

15 U.S.C. § 1125(c)(1) ................................................................5

**Other Authorities**

4 Thomas J. McCarthy, McCarthy on Trademarks and Unfair
    Competition, § 23:41 (4th ed. 2015) .................................................16

4 Thomas J. McCarthy, McCarthy on Trademarks and Unfair
    Competition, §23:42 (4th ed. 2015) .................................................16

William G. Barber,
    *Trademark and Deceptive Advertising Surveys*, 40 (2012) .................................18

## I.    INTRODUCTION

A well-done survey—with the appropriate format, stimulus, control, and universe—is a valuable asset in a trademark case. Minor, individual survey flaws (*e.g.*, slightly underinclusive universe, clarity of stimulus, etc.) may go to weight. Multiple, fundamental errors in format, stimulus, control, universe, and other characteristics, however, demand exclusion of reports and testimony under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

The flawed methodologies employed by Dr. Stewart and Dr. Pomerantz are fatal, and it would be inappropriate for this Court to allow the jury to receive scientifically-couched testimony with no applicability to the consumer decision-making relevant in this case. *See, e.g., Scott Fetzer Co. v. House of Vacuums Inc.*, 381 F.3d 477, 488 (5th Cir. 2004); *THOIP v. Walt Disney Co.*, 690 F. Supp. 2d 218, 230 (S.D.N.Y. 2010); *see also Siharath v. Sandoz Pharm. Corp.*, 131 F. Supp. 2d 1347, 1371 (N.D. Ga. 2001) ("expert testimony must be supported by 'good grounds' at each step of the causal chain; and any step that renders [an expert's] analysis unreliable also renders the testimony inadmissible."), *aff'd sub nom, Rider v. Sandoz Pharm. Corp.*, 295 F.3d 1194 (11th Cir. 2002); *Simon Prop. Grp. L.P. v. mySimon, Inc.*, 104 F. Supp. 2d 1033, 1050 (S.D. Ind. 2000) (noting "[t]he issue before the court is whether the [*Squirt*] survey SPG proposes is likely to produce results that would help the jury resolve relevant factual disputes," and excluding

1

survey because "the answer is clearly no"); Dkt. 151 at 3 (acknowledging that surveys not "conducted according to accepted principles" are not admissible).

Dr. Stewart's report and testimony should be excluded because he:

(1)   presented the Exxon marks and the FXX mark together in the same survey, despite the fact that no one in the real world encounters the parties' marks at or near the same time or place;

(2)   did not present the parties' marks as they appear in the marketplace; and

(3)   failed adequately to control for survey "noise" by testing other purportedly non-infringing XX designs.

Dkt. 123 at 1.

Dr. Pomerantz's report and testimony should be excluded because he:

(1)   only tested dissected portions of the Exxon and FXX mark;

(2)   presented mark fragments without real-world marketplace context; and

(3)   did not restrict his universe of test subjects to relevant individuals.

Dkt. 123 at 2.

Exxon's brief neither places these facts in dispute nor dispels their legal significance. Each flaw alone would justify excluding the study; in combination, these flaws are utterly fatal to Dr. Stewart and Dr. Pomerantz's opinions.

## II.   THE STEWART SURVEY SHOULD BE EXCLUDED

### A.   Dr. Stewart Did Not Use the Proper Survey Format for this Case.

Dr. Stewart's decision to use a *Squirt* format is not justifiable, and he ignored well-established rules that must be followed to conduct a reliable and

admissible *Squirt* survey. Dkt. 123 at 8.

### 1.  Proximity of the Parties' Brands

Exxon does not deny that a *Squirt* survey is only appropriate where "the brands exist together in the market or one is typically encountered . . . soon after the other."[1] *Compare* Dkt. 123 at 8 with Dkt. 151 at 12. And as the court in *THOIP*, 690 F. Supp. 2d at 235 (emphasis added) effectively held, "'a sequential presentation of the two marks at issue . . . is appropriate *only* if it reflects *a significant number of real world situations* in which both marks at issue are likely to be evaluated sequentially or side-by-side.'" *See also Kargo Global, Inc. v. Advance Magazine Publishers, Inc.*, No. 06 Civ. 550(JFK), 2007 WL 2258688, at *7 (S.D.N.Y. Aug. 6, 2007). Instead, Exxon urges that "consumers *may* easily encounter both parties' marks." Dkt. 151 at 12.

The only situations in which consumers might encounter the parties in close proximity, however, are completely hypothetical and exceedingly rare. A driver could be watching a TV show on an iPad and drive into an Exxon station; or an apartment dweller could be watching TV in an apartment that overlooks an Exxon station, and look out the window. But Exxon does not provide any *evidence* that

---

[1] FX cites numerous cases holding that use of a *Squirt* survey where the parties' marks are not viewed in proximity "renders that survey inadmissible." Dkt. 123 at 8-9. Exxon tries to distinguish those cases by arguing that the surveys "were excluded for multiple reasons" (Dkt. 151 at 8); of course, FX also provides this Court with "multiple reasons" to exclude Dr. Stewart's survey.

consumers do encounter the parties' marks in physical or temporal proximity in a way that justifies the use of a *Squirt* format, and under *Daubert*, "[i]t is the proponent of the testimony that must establish its admissibility by a preponderance of proof." *Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244, 251 (6th Cir. 2001) (citing *Daubert,* 509 U.S. at 592 n.10). In reality, the parties offer their goods and services in *totally* separate industries and contexts.

By using a *Squirt* survey in this instance, Dr. Stewart failed to use a generally accepted methodology for conducting his confusion survey. Instead, he forced survey respondents to see stimuli that do not typically or regularly exist in close proximity in the real world. Dr. Stewart's "artificial, seriatim presentation of non-competing marks bears so little resemblance to the actual experience of consumers, that the confusion the survey purports to show has very little probative value." *Kargo Global*, 2007 WL 2258688, at *8. As a result, the survey should be excluded. *See THOIP*, 690 F. Supp. 2d at 640-41.

### 2. Accessibility of the Senior Brand in Memory

The parties agree that a *Squirt* survey format is only appropriate when "the senior brand is not 'accessible' in memory." *Compare* Dkt. 123 at 8 *with* Dkt. 151 at 5. From the inception of this case, Exxon has argued that its marks are "strong," as well as "famous," for the purposes of its federal dilution claim,[2] which requires

---

[2] E.g., Dkt. 15, ¶ 19; Dkt. 145 at 16; Dkt. 145-2 at 20.

a showing of *nationwide* fame. 15 U.S.C. § 1125(c)(1). Incredibly, Exxon now claims—for this motion only (and solely to save Dr. Stewart's fatally flawed survey)—that its marks are not "'accessible in memory' without aid in every geographic location in the country."[3] Dkt. 151 at 5-6. But Exxon cannot have it both ways—either the interlocking X marks are famous (i.e., "a household name" nationally), or they are not. *Bd. of Regents, Univ. of Tex. Sys. ex rel. Univ. of Tex. at Austin v. KST Elec., Ltd.*, 550 F. Supp. 2d 657, 674 (W.D. Tex. 2008).

Despite the clear legal rule that a *Squirt* format is inappropriate for well-known marks (and that the *Eveready* format should be used instead), Exxon claims that "[c]ourts have . . . approved *Squirt*-style surveys for very-well known marks" and that FX's "experts have also done *Squirt*-style surveys in connection with very well-known marks." Dkt. 151 at 6-7. Not one of Exxon's citations supports this claim, and Exxon relies solely on its own unsubstantiated opinion of what constitutes a "very well-known mark":

- In *Blockbuster*, no allegations were made that BLOCKBUSTER or BLOCKBUSTER VIDEO was famous. *See Blockbuster Entm't Grp., Div. of Viacom, Inc. v. Laylco, Inc.*, 869 F. Supp. 505, 514 (E.D. Mich. 1994).

- In 24-HOUR FITNESS, the court actually held the mark was "plainly descriptive" and not "distinctive or famous" and that evidence of secondary

---

[3] Of course, even if true, a *Squirt* format only would be appropriate in those geographic areas where Exxon's marks are *not* famous. Dr. Stewart could have segregated the data by state or other geographic region, but he did not. And Dr. Stewart's survey and report lacks any data permitting the fact-finder to parse such a geographic distinction.

meaning was "far from compelling." *24 Hour Fitness USA, Inc. v. 24/7 Tribeca Fitness, LLC*, 277 F. Supp. 2d 356, 362, 366 (S.D.N.Y. 2003). Mr. Johnson's testimony, cited by Exxon, makes it clear that he used a *Squirt* format there because the mark was *not* well known. Dkt. 151, Ex. 2 at 154:14-19.

- Exxon relies *solely* on eight-lines of deposition testimony to assert that FX's expert Dr. Simonson conducted a *Squirt* survey "related to the well-known mark MONSTER ENERGY" (Dkt. 151 at 6):

  > Q. Would you consider the sequential presentation to be a common variation of the SQUIRT format?
  > A. I've seen sequential presentation before, yes. In fact, I've used it.
  > Q. In what cases have you used sequential presentation?
  > A. Well, I've used it in a case related to Monster Energy.

  With nothing more, it is impossible to tell (i) what was tested—the mark MONSTER ENERGY or something entirely different; or (ii) whether there were allegations or findings in the case related to the mark being "famous" or "well-known."

In summary, Dr. Stewart's *Squirt*-format survey is fatally flawed because it is inapplicable to Exxon's claims in this case and would mislead a jury.

### B. Dr. Stewart Failed to Present the Marks in Real-World Context.

Because confusion surveys are intended to act as a measure of likely confusion *in the marketplace*, surveys must present the marks to respondents in the manner in which consumers really encounter those marks. Dkt. 123 at 9. Yet, Exxon argues that showing the parties' marks in an actual context in which they are used is somehow "misleading." Dkt. 151 at 8. Neither Exxon nor Dr. Stewart, however, offer: (i) **any** case law or survey literature supporting this speculation; (ii) **any** example of a misleading or unrepresentative display of either mark at

issue; or (iii) **any** suggestion that, as an expert, Dr. Stewart could not have come up with stimuli that fairly represented the marks at issue or the context in which they typically appear. Instead, it is Dr. Stewart's out-of-context presentation of black logos on a white background that is misleading because it does not measure whether confusion *in the real world* is likely. *See* Dkt. 123 at 9-11.

Exxon argues that "as long as the survey is 'conducted according to accepted principles, [it] should ordinarily be found sufficiently reliable under *Daubert*' ...." Dkt. 151 at 3. There is, however, perhaps no *more* accepted survey principle than the maxim that survey stimuli should appear in context. E.g., *Water Pik, Inc. v. Med-Sys., Inc.*, 726 F.3d 1136, 1145-47 (10th Cir. 2013); *Componentone, L.L.C. v. Componentart, Inc.*, No. 02:05cv1122, 2008 WL 4790661, at *24 (W.D. Pa. Oct. 27, 2008); *Malletier v. Dooney & Bourke, Inc.,* 525 F. Supp. 2d 558, 593 (S.D.N.Y. 2007); *Juicy Couture, Inc. v. L'Oreal USA, Inc.,* No. 04 civ.7203(DLC), 2006 WL 1012939, at *25 (S.D.N.Y. Apr. 19, 2006); *M.D. On-Line, Inc. v. WebMD Corp.*, No. 05-CV-4081 (WJM), 2005 WL 2469668, at *7 (D. N.J. Oct. 6, 2005); *WE Media Inc. v. Gen. Elec. Co.*, 218 F. Supp. 2d 463, 474 (S.D.N.Y. 2002); *Conopco, Inc. v. Cosmair, Inc.*, 49 F. Supp. 2d 242, 253-54 (S.D.N.Y. 1999). One court went so far as to award attorney's fees for the prevailing party "for the period following the close of fact discovery," in part because the non-prevailing party offered a confusion survey that failed to show the relevant marks

in context. *Juicy Couture, Inc. v. L'Oreal USA, Inc.*, No. 04 civ.7203(DLC), 2006 WL 2591478, at *6-*8 (S.D.N.Y. Sept. 11, 2006) ("The most fundamental flaw in the study, the failure to present the products as they were seen in the marketplace, must have been readily apparent to Couture's experienced counsel.") (emphasis added).

Exxon's post-hoc justification for Dr. Stewart's flawed stimuli is that both parties' marks can be found on the internet (or on mobile devices) and, therefore, visual, competitive, and marketplace context all become irrelevant. Yet again, Exxon provides no authority for this unique proposition. In the only case Exxon cites (Dkt. 151 at 9), the court expressly held that the survey was "flawed" because it "used cards bearing the designers' names **instead of actual products—such as handbags**." *Gucci v. Gucci Shops, Inc.*, 688 F. Supp. 916, 926 (S.D.N.Y. 1988) (emphasis added). While the *Gucci* court did give the survey weight,[4] that survey did not suffer from any of the other numerous flaws present in Dr. Stewart's work. *Id*. at 926. And, of course, the products at issue were plaintiff's handbags, leather goods, and fashion items, and defendant's "lamps, sunglasses, furniture, sleep wear, bedding accessories and fabrics, wall coverings, ladies underwear, lingerie,

---

[4] The Southern District of New York has since rejected the proposition that a survey can present marks on a card without further context. *See Juicy Couture, Inc.*, 2006 WL 1012939, at *25; *WE Media*, 218 F. Supp. 2d at 474; *see also J.T. Colby & Co., Inc. v. Apple Inc.*, No. 11 Civ. 4060(DLC), 2013 WL 1903883, at **20-21 (S.D.N.Y. May 8, 2013).

plates and flatware." *Id*. at 919-20. So, unlike the products in this case, the products in *Gucci* could and would likely be sold side-by-side in some stores.

Because internet advertising is widespread, Exxon's argument would reshape well-established law on confusion surveys. Further, Exxon's argument fails to recognize that even if the parties' marks both are used "on the internet," context surrounding that use still must be included. Consumers do not encounter marks on the internet in a vacuum (*i.e.*, a black logo floating on a white background)—they encounter the marks as a part of a website or in advertisements that include other images, colors, and verbiage. Regardless of advertising medium, context still is necessary in a survey purporting to test real-world consumer perceptions.

Exxon's position that context is irrelevant is also not factually supportable. Dr. Stewart showed two of Exxon's marks at the same time: Exxon's EXXON logo and the Interlocking X Design (the "IXD mark"). Dkt. 123 at 6-7. But Exxon does not use these two marks side by side at all,[5] and they only appear in even remote proximity (on consumer products) in one place—on gas pumps.[6]

---

[5] Exxon did not do any television advertising prior to this lawsuit that featured both the EXXON trademark and the IXD mark. *See* Dkt. 135, Ex. 7 at 74:7-15; 75:18-24. Exxon does not use the IXD mark on social media sites, YouTube, or mobile apps. *See id.* at 146:13-153:25.

[6] Defendants claim that the EXXON mark and the IXD mark are presented "in only black on a white background" and in close proximity in certain contexts like "on chemicals packaging." Dkt. 151, 10. However, the product packaging Exxon refers to is for

Because gas pumps are the only place where the EXXON mark and the IXD mark appear in even arguable proximity, Dr. Stewart should have shown the marks in that context in his survey—on a picture of a gas pump. The same is true for all of the other marks shown, including FXX. Instead, Dr. Stewart chose to provide no marketplace context in order to manufacture his preferred survey result (presumably recognizing that in the real world, and under actual marketplace conditions, consumers are not likely to confuse the parties' marks).

## C.    The Stewart Survey Did Not Include a Proper Control.

The parties agree that the proper control for a likelihood of confusion survey is to use the closest non-infringing alternative of the FXX mark. Dkt. 123 at 11; Dkt. 124, Ex. 15 at 109:8-110:10; Dkt. 151 at 10. Exxon also recognizes that the "element in question" in this case is "an interlocking double X design." Dkt. 151 at 12. And Exxon does not deny that it previously represented to this Court that third-party marks (like the TJ MAXX mark), incorporating two "overlapping" or "four-stroke" X's do not infringe its rights. *See e.g.,* Dkt. 91 at 3; *see also* Dkt. 124, Ex. 2 at 9:21-10:4; Ex. 3 (Nos. 389-93); Ex. 7 at 254:11-256:5; 272:9-11. Indeed, a large part of Exxon's "exclusive use" argument rests on a four-stroke mark (like the TJ MAXX mark) being distinct from Exxon's three-stroke marks, and now Exxon

---

business-to-business chemical products and is not seen by the consumers relevant to this case, *see* Dkt. 127-1, at 9, ¶ 28, and Dr. Stewart's research does not even purport to encompass those specialized business consumers.

essentially concedes what FX has been saying along—that consumers view three-stroke and four-stroke marks the same way. In fact, Exxon goes so far as to admit that the non-infringing four-stroke TJ MAXX mark has "more similarities" to Exxon's marks than FX's mark does. Dkt. 151 at 12.

The TJ MAXX mark would have been a good control because it is a non-infringing mark sharing the "element in question." Alternatively, Dr. Stewart could have used *any other* non-infringing double-X design as a control stimulus. Instead, Dr. Stewart included three "controls" that either had *no X at all or just one X* (which obviously was not "interlocking"). His survey is inadmissible because the control is flawed, thus severely and artificially inflating purported confusion because FX's mark was the *only* mark tested that had the XX element.

Despite arguing earlier that the Stewart survey was appropriately devoid of any marketplace context,[7] Exxon now argues that the TJ MAXX mark is an inappropriate control because it does not belong to the "same genre or industry" as FX's mark. Dkt. 151 at 11. Of course, *Exxon and FX* do not use their marks in the same industry or on the same genre of goods either. Accordingly, use of a control with interlocking Xs from a different genre or industry—like the TJ MAXX

---

[7] On the one hand, Exxon argues a *Squirt* survey is appropriate because not everyone knows Exxon; on the other hand, Exxon assumes all people know Exxon is in the oil and gas industry and that all of Stewart's other logos are TV stations. Exxon makes this argument even though FXX is new, FLIX and IFC are not popular, and ITV is not even broadcast in the United States.

mark—only would have made the Stewart survey more reliable.

Moreover, Exxon has a long history of permitting different types of businesses to use double X designs, obviously based on its experience that the use of XX, **in completely different industries**, does not cause appreciable consumer confusion, including by way of example only: TJ MAXX, NEXXUS, MAXX, ORIXX, CAP-XX, XX, NEXXO, AXXIS, FIXXER, and AXXERA. Dkt. 134, Ex. 4. Exxon, having itself set the precedent as to the right of different companies to use XX, cannot object to use of the TJ MAXX mark as a measure of whether interlocking Xs—**on a different business**—creates an objectionable level of real world confusion.[8]

Exxon's reliance on *Pilot Corp. of America v. Fisher-Price, Inc.*, 344 F. Supp. 2d 349 (D. Conn. 2004), is misplaced. The surveys in *Pilot* dealt with *direct competitors* selling the *exact same* product. *Pilot*, 344 F. Supp. 2d at 349. The products at issue were magnetic drawing board toys (Magna Doodle and Doodle Pro). *Id.* All of the test and controls in the plaintiff's survey were from the same general product category of toys but were not magnetic drawing boards. *Id.* at 358-59. The only magnetic drawing board in the survey was the defendants' toy. The

---

[8] Indeed, Dr. Stewart previously insisted, when testifying on Exxon's behalf in a case involving Exxon's cartoon tiger and Kellogg's Tony the Tiger, that Kellogg's confusion survey control needed to be, not just any tiger, but one of the cartoon characters that Kellogg had permitted for years to coexist with Tony the Tiger. *See* Supplemental Declaration of Jessica A. Pratt ("Supp. Pratt Dec."), Ex. 34 at 10.

defendants in *Pilot* thus had a legitimate argument that using other toys as controls inflates confusion—but not because of an association between the *logos*, which is what was being tested, but because of an association between the *types of toys*. *Id*. at 359.[9] Here, the parties are not competitors and do not sell any products in the same category, so the concern raised in *Pilot* is inapplicable.

Of course, the Stewart survey does not mention the relevant industry for any of the trademarks shown. Ultimately, by *concealing the differences* in Exxon's gas and oil business and FX's television business, the Stewart survey: (a) eliminated the similarity of businesses from the likelihood of confusion calculus; (b) necessarily "exaggerated the similarities between the two marks";[10] and (c) did "not prove actual consumer confusion [*e.g.,* that Exxon had gone into the television business or was now sponsoring FX] . . . , but instead tested [only] the ability of participants to pick the most obvious match." *Brighton Collectibles, Inc. v. RK Tex. Leather Mfg.,* 923 F. Supp. 2d 1245, 1257 (S.D. Cal. 2013).

Dr. Stewart's failure to use a single control incorporating two Xs caused consumers to select the FXX mark *not* because of any actual confusion but because it was the only mark that had two Xs (not to mention the only mark with

---

[9] In other words, respondents would likely pick the defendants' board because it was the only product the same as the plaintiff's product—not because of similarities between the parties' logos. *Id*. As a result, the court favored the surveys conducted by the defendants, which used other magnetic drawing boards as controls because they helped isolate the element at issue. *Id*.

[10] *Water Pik, Inc.,* 726 F.3d at 1147.

interlocking, overlapping, or touching Xs).[11] As such, it is an entirely unreliable measure of likely confusion and should be excluded.

## III.   DR. POMERANTZ'S TESTS SHOULD BE EXCLUDED

Exxon claims that because the Pomerantz study is not a survey, it need not meet the generally accepted standards of reliability for consumer perception evidence in trademark cases. While the standards FX relies on in its motion often are applied to survey experts, that is only because surveys—not "Where's Waldo" tests or subjective "Tversky" analyses—*are* the generally accepted methodology for assessing consumer perception in trademark cases. Exxon's desire to have the Court ignore the rules governing empirical evidence in trademark cases underscores the fact that the Pomerantz study does not reliably test relevant consumer perception and therefore is inadmissible.

### A.    The Pomerantz Study Tested only a Fragment of the FXX Mark.

Dr. Pomerantz inappropriately dissected the FXX mark. Similarity of the marks is one of the eight digits of confusion evaluated in a likelihood of confusion analysis, *Scott Fetzer*, 381 F.3d at 486, and is assessed by analyzing the marks as a whole in appearance, sound, and meaning. *Firefly Digital Inc. v. Google Inc.*, 817 F. Supp. 2d 846, 863 (W.D. La. 2011). At most, Exxon could proffer Dr.

---

[11] This was empirically proven by Mr. Johnson, who replicated Dr. Stewart's survey but used a proper control (TJ MAXX), resulting in a miniscule result not evidencing likely confusion. Dkt. 124, Ex. 11 at 6-7, 10.

Pomerantz to assess visual similarity (*i.e.*, one-third of one-eighth of the overall likelihood of confusion analysis), admitting that "Dr. Pomerantz's study did not purport to assess likelihood of confusion or any specific likelihood of confusion factor, nor did he test or opine on the marks sound, meaning, connotation, or overall commercial impression." Dkt. 151 at 17. Accordingly, Dr. Pomerantz's study and opinions are thus not only unreliable, but are utterly irrelevant because he admittedly did not test the entire FXX mark at issue.

By using only a fragment of the FXX logo, the Pomerantz study is in clear violation of black-letter law.[12] Dkt. 123 at 15-18. None of the cases relied on by Exxon support its position. Indeed, Exxon cites law the same way Dr. Pomerantz tests trademarks—by using only the fragment it hopes will help its cause—but a full review of Exxon's cited authority demonstrates the fallacy of its position. *See* Dkt. 151 at 17 (citing *Paul Sachs Originals Co. v. Sachs*, 217 F. Supp. 407, 417 (S.D. Cal. 1963), *aff'd*, 325 F.2d 212 (9th Cir. 1963) ("A Court's dissection of a trademark may be comparable to diagramming an English Sentence. It is an helpful analysis of the whole. Although in this process one part of a mark may be laid beside the comparable element of another, **the two marks are to be considered in**

---

[12] Exxon's argument that FXX uses a stand-alone XX logo as a trademark is simply wrong. The XX it refers to in its Complaint and opposition motion is a design element, not a trademark, that FXX displayed in a commercial that ran for a very brief period two years ago. Moreover, the XX design element was not a static element. For the few seconds that it was seen on screen, it was moving and partially obscured for almost all of those moments. *See* Dkt. 135, Ex. 2 at 53:12-22.

**their entireties**.") (emphasis added); *Xtreme Lashes, LLC v. Xtended Beauty, Inc.*, 576 F.3d 221, 228 (5th Cir. 2009) ("Similarity of appearance is determined on the basis of the total effect of the designation, rather than on a comparison of the individual features.") (internal quotation marks omitted)).[13]

Finally, Exxon makes the argument that cases finding surveys inadmissible for dissecting marks are not applicable here because Dr. Pomerantz did not conduct a survey. However, cases finding that the surveys fail because they violate the rule against dissection (which is a legal requirement for analyzing trademarks) do so because the research fails to test relevant issues, not *because* they are surveys. To be relevant and admissible, *any* scientific study of a trademark must comply with the rule against dissection.

### B.    Dr. Pomerantz Failed to Provide any Real World Context.

Dr. Pomerantz intentionally chose to present the marks in contexts in which consumers do not encounter them. He neglected to use color despite admitting, and publishing scholarship regarding, the fact that color helps people distinguish

---

[13] Exxon's reliance on McCarthy as support for dissection is equally inappropriate. *See* 4 Thomas J. McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION, §§ 23:41 and 23:42 (4th ed. 2015) (Dkt. 151-2). First, neither the FXX mark nor the Exxon marks are composite marks—FX does not use either X or XX as a separate mark, and Exxon does not use EON as a separate mark. Second, giving more weight to dominant portions of composite marks is largely about discounting the weight given to unprotectable elements. *See* 4 MCCARTHY, *supra*, § 23:42. Third, Exxon has not proffered any evidence suggesting that the XX portion of its marks is more dominant/distinctive than the E, O, and N or the impact of the mark as a whole.

between visual objects.[14] He showed the marks in eight different orientations despite the fact that they never appear in seven of those ways, including upside down, which he defended on the basis that people might stand on their head while pumping gas.[15] And he failed to show the marks as they appear on gas pumps, on television, or in any other context in which they actually appear.

Exxon does not cite a single case in support of the argument that it is unnecessary to present the marks in the proper context.[16] Instead, Exxon attempts to justify its reliance on legally incorrect positions, claiming for example that "[b]y introducing elements such as color into the 'Where's Waldo' test, subjects would be able to identify the 'odd' mark in the test by its color, rather than by difference in its shape or form (what was being tested)." Dkt. 151 at 19. But that is exactly FX's point—showing the parties' marks in full and as they are actually seen by consumers allows consumers to distinguish between the parties' marks.[17]

### C.     Dr. Pomerantz Failed to Limit His Study to Relevant Consumers.

Finally, Dr. Pomerantz made no effort to determine whether the people participating in his test were likely ever to encounter the FXX mark, which is a

---

[14] Dkt. 123 at 18.

[15] Dkt. 123 at 19 (quoting Pomerantz Dep. at 135:3-136:10).

[16] Exxon again dismisses cases cited by FX because they involve surveys, but again this argument fails because the cases are applicable not just to surveys but to any *relevant* consumer perception study of a trademark.

[17] Exxon's claim that the Tversky analysis "by design compares features other than color" is simply false. *See, e.g.*, Suppl. Pratt Dec., Ex. 33 (Pomerantz Dep. at 220:24-222:3).

fatal flaw. William G. Barber, *Trademark and Deceptive Advertising Surveys*, 40 (2012) ("[I]n cases where . . . the data does not include an identifiable subgroup of relevant consumers, the . . . proponent is flirting with disaster.").[18] For consumer perception studies to be valid, "the persons interviewed must adequately represent the opinions which are relevant to the litigation," which means prospective customers of the alleged infringer's services. *See Scott Fetzer Co.*, 381 F.3d at 487 (internal quotations omitted). This is particularly true where the parties do not sell competitive goods. Barber, *supra*, 29 ("[W]here the parties' are not direct competitors but instead sell different types of products or services to different types of consumers, tailoring the survey universe to the junior user's market is critical."). Evidence that some humans perceive some portion of a mark some way is neither helpful nor relevant because those humans may never encounter the FXX mark in the real world.

## IV.   CONCLUSION

FX respectfully requests that the Court exclude from evidence the expert reports and testimony of Dr. Stewart and Dr. Pomerantz.

---

[18] This chapter of *Trademark and Deceptive Advertising Surveys* was written by William G. Barber, one of the named partners for Exxon's law firm Pirkey Barber.

Respectfully submitted this 13th day of August, 2015.

                                    *s/ William H. Brewster*
                                    William H. Brewster (*pro hac vice*)
                                    (*Attorney-in-charge for Defendants*)

Paul L. Mitchell                    R. Charles Henn Jr. (*pro hac vice*)
Tex. Bar No. 14217920               Sabina A. Vayner (*pro hac vice*)
(Fed. Bar. No. 07495)               Jessica A. Pratt (*pro hac vice*)
Brian C. Pidcock                    **KILPATRICK TOWNSEND & STOCKTON LLP**
Tex. Bar No. 24074895               1100 Peachtree Street, Suite 2800
(Fed. Bar No. 1654553)              Atlanta, Georgia 30309-4528
**ANDREWS KURTH LLP**               Telephone: (404) 815-6500
600 Travis, Suite 4200              Facsimile: (404) 815-6555
Houston, Texas 77002
Telephone: (713) 220-3995           Larry McFarland (*pro hac vice*)
Facsimile: (713) 238-7246           **KILPATRICK TOWNSEND & STOCKTON LLP**
                                    9720 Wilshire Boulevard PH
                                    Beverly Hills, California 90212-2018
                                    Telephone: (310) 777-3750
                                    Facsimile: (310) 388-5917

                                    *Attorneys for Defendants*

19

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

EXXON MOBIL CORPORATION,              )
                                      )
              Plaintiff,              )
                                      )        Civil Action No. 4:13-cv-02906
       v.                             )
                                      )
FX NETWORKS, LLC, TWENTIETH           )
CENTURY FOX FILM                      )
CORPORATION, TWENTY-FIRST             )
CENTURY FOX, INC., and FXX            )
NETWORK, LLC                          )
                                      )
              Defendants.             )

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that a true and correct copy of the foregoing

document was filed electronically using the CM/ECF system on August 13, 2015,

which will automatically notify and effect service on all counsel of record for

Plaintiff, who are deemed to have consented to electronic service via the Court's

CM/ECF system, per L.R. 5.3:

                              *s/ Jessica A. Pratt*
                              Jessica A. Pratt
                              *Attorney for Defendants*

20